UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIARA THORNTON.,

                 Plaintiff,                     Case No. 21-10858

v.                                          HON. MARK A. GOLDSMITH

SAM CARAMAGNO, et al.,

                   Defendants.

_____/

### OPINION & ORDER
### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Dkt. 11)

This matter is before the Court on Defendants' motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. 11). For the reasons stated below, the Court grants in part and denies in part the motion.[1]

### I. BACKGROUND

Plaintiff Kiara Thornton brings this action against Defendants Sam Caramagno, Susan Gottlieb, and Good 4 Your Soul, LLC d/b/a Gottlieb Group Real Estate (Gottlieb Group) based on the sale and purchase of real property in Wayne County, Michigan. Am. Compl. (Dkt. 9). Thornton was the prospective purchaser of the property; Caramagno was the owner of the property; and Gottlieb, who is Caramagno's mother, was the associate broker for Gottlieb Group, which served as the broker for the sale of the property. Id. ¶ 7. On April 21, 2020, Thornton discovered the property through active online listings. Id. ¶ 8. The following day, she contacted Gottlieb to

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiff Kiara Thornton's response (Dkt. 12) and Defendants' reply (Dkt. 13).

ask if the property was available. Id. ¶¶ 8–9. Gottlieb confirmed that it was available. Id. ¶ 9.

Thornton then sent an offer letter to Gottlieb. Id. ¶ 13.

On April 24, 2020 at 3:23 a.m., Gottlieb sent Thornton a Buy/Sell Agreement that had been

signed by Gottlieb and Caramagno, along with other documents related to the sale of the property.

Id. ¶ 15. The agreement contained a provision stating that "Buyer gives Broker until 4/24/2020

at 5:00 p.m. to obtain Seller's written acceptance of Buyer's Offer." Resp. at 7 (Dkt. 12). Thornton

and Gottlieb sent emails regarding revisions to the agreement throughout the day on April 24,

2020. Am. Compl. ¶ 16. On April 24, 2020 at 5:16 p.m., Thornton sent Gottlieb an email that

stated that she would sign the finalized agreement "as soon as" Gottlieb sent it to her. Id. ¶ 17.

Gottlieb sent the agreement to Thornton at 5:19 p.m. that day. Id. ¶ 18. Thornton electronically

signed it at 5:26 p.m., and Caramagno signed it at 5:29 p.m. Resp. at 8.

The agreement contained the following provisions:

> Seller represents to the best of Seller's knowledge and belief that: . . . [t]here is no
> pending or threatened litigation, administrative action, or claim relating to the
> property.

> Seller represents to the best of Seller's knowledge and belief that: . . . after the date
> hereof, the Seller will not enter into any Agreement pertaining to the property or
> any modification of, or release from, an existing lease or rental agreement without
> the prior, written consent of Buyer.

Purchase Agreement at PageID.35–40 (Dkt. 9).[2]

On the same day that Thornton signed the purchase agreement, she and Gottlieb discussed

scheduling the appraisal and inspection of the home. Am. Compl. ¶ 23. According to Thornton,

Gottlieb stated in a telephone call that day that selling the home had been a "long process" and that

---

[2] The purchase agreement is attached to the complaint, so the Court may consider it on the motion
to dismiss. Com. Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007)
("[D]ocuments attached to the pleadings become part of the pleadings and may be considered on
a motion to dismiss.").

all prior offers "had fallen through."  Id. ¶ 24.  On April 27, 2020, Thornton mailed an earnest money deposit check for $1,000 and informed Gottlieb that she had done so.  Id. ¶ 28.

Thornton drove with her mother and sister to the property to show them the home that she was purchasing, and, at that time, a neighbor observed her.  Am. Compl. ¶ 31.[3]  Thornton alleges that, following her visit to the home and the neighbor's observation of her, Defendants learned of her race (African American) and that, because of this information, they took actions to prevent her from purchasing the home.  Id. ¶¶ 38–57, 69.

On April 28, 2020, Gottlieb called Thornton and informed her that a prior prospective purchaser, who was no longer interested in the property, had never signed a termination of the purchaser's offer.  Id. ¶ 33.  Gottlieb stated that she needed to obtain the prospective purchaser's signed termination of the offer before she could proceed with the sale to Thornton.  Id. ¶¶ 33–34. According to Thornton, this was the first time that Gottlieb mentioned an impediment to the sale of the property.  Id. ¶ 33.  During a later call on April 28, 2020, Gottlieb told Thornton that she desired to terminate Thornton's agreement, and she then sent Thornton a document titled "Termination of Authorized Buy/Sell Agreement and Agreement as to Disbursement of Earnest Money." Id. ¶¶ 35–36.  Thornton declined to sign the termination.  Id. ¶ 37.  Gottlieb told Thornton that she would contact Thornton's employer (which was also Thornton's loan processor) if Thornton did not sign the agreement.  Id.  ¶ 43.  Gottlieb then contacted this company, stating that the sale of the property was no longer proceeding and that Thornton had signed a termination agreement.  Id.  ¶ 45.  Gottlieb also directed the company to cancel the appraisal.  Id.  In addition, Gottlieb informed the company with which Thornton had deposited her earnest money that the

---

[3] The amended complaint does not specify the date on which Thornton visited the home with her mother and sister.  However, Thornton alleges that she visited the home before Gottlieb contacted her on April 28, 2020 at 1:52 p.m. about a previous offer for the property.

transaction was cancelled, that the sales agreement was invalid, and that the company should not contact the seller.  Id. ¶¶ 51, 55.

Ultimately, Caramagno sold the property to another purchaser for $25,000 less than Thornton's offer.  Id. ¶ 68.

## II. ANALYSIS[4]

Thornton alleges that Defendants' quick reversal of the sale and failure to perform under the terms of the contract occurred because they became aware that Thornton is African American.  Id. ¶ 59.  She asserts that Defendants refused to sell her the property because of her race and color in violation of the Fair Housing Act (FHA), 42 U.S.C. 3601 et seq.; 42 U.S.C. § 1981; 42 U.S.C. § 1982; the Equal Protection Clause and the Due Process Clause of the federal and Michigan constitutions; and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. L. § 37.2502.  Id. ¶¶ 63–92.  She also brings breach of contract, tortious interference, and misrepresentation/fraud claims.  Id. ¶¶ 93–134.  Defendants' arguments for dismissal of each of these claims are addressed in turn.

### A.  Equal Protection and Due Process Claims

Thornton alleges that Defendants' conduct in refusing to sell her the property, intimidating and harassing her, and subsequently selling the property to another person violated the Equal Protection Clause and the Due Process Clause of the federal and Michigan constitutions.  Am.

---

[4] To survive a motion to dismiss, a plaintiff must allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).  The defendant has the burden of showing that the plaintiff has failed to state a claim for relief.  Id.

Compl. ¶ 90. Defendants contend that these claims should be dismissed because Defendants are private actors. Mot. at 17–18.

"[T]he Fourteenth Amendment . . . applies only to state—not private—conduct." Phillips v. Tangilag, 14 F.4th 524, 532 (6th Cir. 2021). Likewise, the equal protection and due process clauses of the Michigan constitution provide protection only against state action and do not extend to purely private conduct. Scalise v. Boy Scouts of America, 692 N.W.2d 858, 872 (Mich. Ct. App. 2005) (explaining that the Equal Protection Clause of the Michigan Constitution is coextensive with the Equal Protection Clause of the federal Constitution and that, therefore "the Michigan Constitution, like the United States Constitution . . . protects individuals from discriminatory state action") (punctuation modified); Nat'l Airport Corp. v. Wayne Bank, 252 N.W.2d 519, 574 (Mich. Ct. App. 1977) ("It is unquestioned that state action is required . . . to assert a denial of due process under both the Michigan and United States Constitutions."). Non-government actors, however, must comply with constitutional commands when their conduct "may be fairly treated as that of the State itself." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001).

Caramagno, Gottlieb, and Gottlieb Group are private actors. Thornton does not allege that any of Defendants' conduct may be fairly treated as that of the state itself or that it otherwise constitutes state action. Therefore, Defendants are entitled to dismissal of Thornton's equal protection and due process claims under the federal and Michigan constitutions.

## B. FHA and ELCRA Claims

Thornton alleges that Defendants violated the FHA and ELCRA by, on the basis of her race and color, taking actions such as refusing to sell her the property after she made a bona fide offer or to negotiate for the sale of the property; discriminating against her in the terms, conditions, and

privileges of the sale or the services connected to it; and representing that the property was unavailable when it was available.  Am. Compl. ¶¶ 71, 81.

The FHA prohibits discrimination against "any person because of race, color, religion, sex, familial status, or national origin" in real estate transactions.  42 U.S.C. § 3604(a).  Through ELCRA, Michigan has enacted an analogous fair housing provision.  Mich. Comp. L. § 37.2502. In interpreting Michigan's fair housing law, courts refer to its federal counterpart for guidance. Mencer v. Princeton Square Apartments, 228 F.3d 631, 634–635 (6th Cir. 2000).  Therefore, the Court analyzes Thornton's FHA claim and ELCRA claims together.

Defendants contend that Thornton's claims alleging racial discrimination in housing should be dismissed because Thornton has failed to establish a prima facie claim of housing discrimination and, even if she had established a prima facie case, she has not established that Defendants' legitimate, nondiscriminatory reason for not selling the property to her was pretextual.  Mot. at 10–13.  Defendants also contend that Thornton's allegations of racial discrimination are conclusory and do not show that Defendants' actions were motivated by the fact that Thornton is African American.  Mot. at 8–9.  They argue that Thornton has set forth only one relevant factual allegation that is entitled to the presumption of truth—that she is African American—which is insufficient to make her racial discrimination claims plausible.  Id. at 10.

The Court addresses each argument in turn.

### 1.  Prima Facie Case

The McDonnell Douglas burden-shifting framework applies to federal housing discrimination claims, whether they are brought under the FHA, § 1981, or § 1982.  Mencer, 228 F.3d at 634. Under this framework, a plaintiff has the ultimate burden of making out a prima facie case by showing "(1) that he or she is a member of a racial minority, (2) that he or she applied for and was

6

qualified to rent or purchase certain property or housing, (3) that he or she was rejected, and (4) that the housing or rental property remained available thereafter." Id. at 634–635. If the plaintiff satisfies the prima facie requirements, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for rejecting the plaintiff. Id. at 634. Then, the burden shifts back to the plaintiff to show that the defendant's non-discriminatory reason is a pretext. Id. "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).

At the motion-to-dismiss stage, however, Thornton is not required to plead a prima facie case or show that Defendants' legitimate, nondiscriminatory reason for not selling the property to her was pretextual. In Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510 (2002), the Supreme Court of the United States explained that "[t]he prima facie case under McDonnell Douglas . . . is an evidentiary standard, not a pleading requirement." The Court explained that the "precise requirements" of a prima facie case can vary depending on context and may be difficult to define before discovery has revealed relevant facts and evidence. Id. at 512. Because the prima facie case "operates as a flexible evidentiary standard," the Court determined that it "should not be transposed into a rigid pleading standard for discrimination cases." Id.

While Swierkiewicz involved claims of racial and age discrimination in employment, the United States Court of Appeals for the Sixth Circuit has extended its holding to housing-discrimination claims. Lindsay v. Yates, 498 F.3d 434, 439–440 (6th Cir. 2007) ("Swierkiewicz applies to any claim covered by the McDonnell Douglas framework."). Following Swierkiewicz, the Sixth Circuit has consistently held that McDonnell Douglas "does not set the standard for pleading any complaint." Lindsay, 498 F.3d at 439–440; see also Pedreira v. Ky. Baptist Homes for Children, Inc., 579 F.3d 722, 728 (2009) (explaining that an analysis of the prima facie case

under this framework is "premature" at the motion-to-dismiss stage); Keys v. Humana, Inc., 684 F.3d 605, 609 (6th Cir. 2012) (reaffirming that Swierkiewicz remains good law after the Supreme Court's decisions in Ashcroft v. Iqbal, 556 U.S. 662 (2008) and Twombly, 550 U.S. at 555).

Accordingly, the Court rejects Defendants' argument that Thornton's FHA and ELCRA claims should be dismissed for failure to plead a prima facie case of housing discrimination.

### 2.  Sufficiency of Allegations

"Although the plaintiff may survive a motion to dismiss without pleading a prima facie case of discrimination, the complaint must nevertheless allege sufficient 'factual content' from which a court could 'draw the reasonable inference' of . . . discrimination." James v. Hampton, 592 F. App'x 449, 461 (6th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).  The complaint need not present "detailed factual allegations." Keys, 684 F.3d at 610 (punctuation modified).  But "[a] complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations does not sufficiently show entitlement to relief." HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 612 (6th Cir. 2012).

Thornton has plead sufficient facts to state a claim of race discrimination that is plausible on its face.  Lindsay, a case with similar allegations, provides guidance here.  There, a Black couple brought an action against a homeowner, a realty company, and a realtor.  498 F.3d at 437.  The couple alleged that they signed a purchase agreement to buy property for an agreed price; delivered the agreement through the realtor to the homeowner's son, who indicated that he was authorized to negotiate the sale of the property and execute a purchase agreement; and deposited $500 in earnest money with the son.  Id.  They also alleged that, 12 days after the son signed the purchase agreement as the seller of the property, they visited their soon-to-be new home to identify the property lines.  Id.  At that time, they introduced themselves to the homeowner's son.  Id.  The

next day, the realty company and the realtor contacted the couple and informed them that the homeowner intended to terminate the sales contract because she wanted to keep the house for "sentimental reasons."  Id.  The couple then filed suit, asserting that defendants unlawfully refused to sell them the property on account of their race, in violation of the FHA, § 1981, § 1982, and an Ohio analogue to the FHA.  Id. at 437.

The Lindsay court found that the plaintiffs pleaded claims for which relief could be granted because they "alleged the statutory bases for their claims" (the FHA, § 1981, and § 1982) and "set forth the factual predicate of those claims."  Id. at 440.  Specifically, the court noted that the plaintiffs alleged that the homeowner advertised her house for sale; that the couple executed a purchase agreement to buy the house; and that nearly two weeks after signing the purchase agreement and depositing $500 in earnest money with the homeowner's son—and one day after the son learned they were Black—the homeowner terminated the contract.  Id.  The court found that "[b]ecause these allegations are sufficient to apprise the Defendants of the Lindsays' claims and the grounds upon which they rest, the Lindsays have satisfied their pleading burden."  Id.  It also determined that the plaintiffs had pleaded "sufficient facts giving rise to a 'reasonably founded hope that the discovery process will reveal relevant evidence' to support their claims."  Id. at 440 n.6 (quoting Twombly, 550 U.S. at 559).

Much like Lindsay, Thornton alleges that Caramagno advertised his house for sale and that Gottlieb confirmed the home's availability; that she and Caramagno signed a purchase agreement, after which she deposited earnest money; and that four days after signing the agreement—and shortly after Defendants learned her race—Caramagno and Gottlieb tried to terminate the agreement.  Thornton has alleged that before she appeared at the property and before her race was observable, Gottlieb stated that the property was available, and Caramagno signed a purchase

agreement to proceed with the sale. Then, after Thornton appeared at the property and after her race was observable, Gottlieb stated that the property was unavailable, and Defendants attempted to terminate the purchase agreement. While the plaintiffs in Lindsay stated that they met the homeowner's son in person, and Thornton states that a neighbor observed her during her visit to the home and that Defendants later became aware of her race, see Am. Compl. ¶¶ 31, 69, the outcome is the same: the homeowner reversed the sale after learning of the buyer's race. Further, Thornton alleges that Caramagno sold the home for $25,000 less than Thornton's offer, making plausible the inference that a non-rational consideration such as racial prejudice motivated Caramagno's reversal. Together, these allegations permit the Court to draw the reasonable inference of racial discrimination and are sufficient to state a claim for relief.

Therefore, Defendants are not entitled to dismissal of Thornton's FHA or ELCRA claims.

**C. 42 U.S.C. §§ 1981 and 1982 Claims**

Thornton alleges that Defendants violated §§ 1981 and 1982 by refusing to sell her the property, intimidating and harassing her, and subsequently selling the property to another person due to Thornton's race and color. Am. Compl. ¶¶ 87, 91.

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors. Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 867–868 (6th Cir. 2001). The statute states that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It defines the right "to make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).

"[T]o establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) [he or she] belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against [him or her] on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." Amini v. Oberlin Coll., 440 F.3d 350, 358 (6th Cir. 2006). Moreover, to prevail on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he or she] would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020) (vacating the Ninth Circuit's ruling that a § 1981 plaintiff need only "plead facts plausibly showing that race played 'some role' in the defendant's decisionmaking process").

Section 1982 prohibits racial discrimination relating to certain interests in real and personal property. United States v. Brown, 49 F.3d 1162, 1166–1167 (6th Cir. 1995). It states that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Like a § 1981 claim, a § 1982 claim requires that a plaintiff plead intentional racial discrimination. Moniz v. Cox, 512 F. App'x 495, 501 (6th Cir. 2013). Courts have interpreted § 1981 and § 1982 in tandem based on their "common language, origin, and purposes." CBOCS West, Inc. v. Humphries, 553 U.S. 442, 448 (2008). Accordingly, the Court analyzes Thornton's §§ 1981 and 1982 claims together.

Defendants' arguments for dismissal of Thornton's § 1981 and § 1982 claims largely mirror their arguments for dismissal of Thornton's FHA and ELCRA claims. Defendants contend that Thornton's §§ 1981 and 1982 claims should be dismissed because they do not show that Thornton is entitled to relief for discrimination on the basis of race or color. Mot. at 13–14. They also argue

11

that Thornton's § 1981 claim should be dismissed in particular because she does not plead any facts showing that, but for her race, Defendants would have sold her the property.  Mot. at 16–17.  For the same reasons stated above, the Court finds that the allegations give rise to a plausible inference that Thornton's race was the but-for cause of the contractual relationship's end.

Defendants put forth an additional argument as to why the Court should find that Thornton has failed to state a claim for relief under § 1981: there was no contractual relationship between Thornton and Defendants.  Mot. at 14–16.  Specifically, Defendants state that the purchase agreement authorized Gottlieb Group to obtain Caramagno's written acceptance of Thornton's offer until April 24, 2020 at 5:00 p.m., and Thornton and Caramagno did not sign the offer until after 5:00 p.m. that day.  Id.

But Thornton does not need to plead facts showing that the purchase agreement was valid and enforceable or that a contractual relationship already existed.  The Supreme Court has held that a § 1981 plaintiff must plead facts showing that he or she "has or would have rights under the existing or proposed contractual relationship."  Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006) (emphasis added).  A contractual relationship need not already exist because § 1981 "protects the would-be contractor along with those who already have made contracts."  Id.  The Supreme Court has explained that the statute "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."  Id.  In line with this determination, the Sixth Circuit has emphasized that a housing-discrimination plaintiff does not need to plead facts showing that a purchase agreement was valid and enforceable to state a claim for relief under the FHA, § 1981, or § 1982.  Lindsay, 498 F.3d at 441–442 (rejecting defendants' argument that plaintiffs must show

that they would have had enforceable rights because of the transaction at issue). Rather, "[p]laintiffs need only show that Defendants' intentionally discriminatory actions impaired their rights under a 'proposed contractual relationship,' such as by preventing them from entering into contracts." Grain v. Trinity Health, 431 F. App'x 434, 450 (6th Cir. 2011) (quoting Domino's Pizza, 546 U.S. at 476).

Thornton has plausibly alleged that she had or would have had rights under an existing or proposed contractual relationship, with which Defendants' alleged discrimination interfered, and that she is seeking to enforce these rights. She has done so by alleging that she and Caramagno both signed the finalized purchase agreement for the sale of the property after Caramagno advertised the property, Gottlieb confirmed the property was for sale, and Gottlieb revised the agreement based on Thornton's requests. Thornton has also alleged that Defendants then failed to perform under the contract by not informing her about a purported existing claim on the property, refusing to sell the property to her based on her race and color, and ultimately selling the property to someone else.

Therefore, Defendants are not entitled to dismissal of Thornton's §§ 1981 or 1982 claims.

**D. Breach of Contract Claim**

Thornton alleges that Caramagno breached the terms of the purchase agreement by (i) refusing to sell her the property and selling it to another, (ii) refusing to allow her to conduct a home inspection, (iii) refusing to provide documents that he relied on in declining to sell the property to Thornton, and (iv) authorizing Gottlieb and Gottlieb Group to interfere with the terms of the purchase agreement. Am. Compl. ¶ 106.

Defendants argue that Thornton has failed to allege the existence of a contract because the purchase agreement lapsed prior to acceptance. Mot. at 19. They state that the agreement

authorized Gottlieb Group to obtain Caramagno's written acceptance of Thornton's offer until April 24, 2020 at 5:00 p.m., and both Thornton and Caramagno signed the agreement after 5:00 p.m. Id.

Thornton has plausibly alleged the existence of a contract. "Before a contract can be completed, there must be an offer and acceptance." Kloian v. Domino's Pizza, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006). An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that [his or her] assent to that bargain is invited and will conclude it." Id. An acceptance sufficient to create a contract occurs when the individual to whom an offer is extended "manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." Id. at 771. Whether the parties have mutually agreed to be bound is "judged by an objective standard, looking to the express words of the parties and their visible acts . . . ." Heritage Broadcasting Co. v. Wilson Comm'ns, Inc., 428 N.W.2d 784, 787 (Mich. Ct. App. 1988).

Thornton has set forth facts regarding the words and acts of the parties that sufficiently allege offer and acceptance. She has stated that, throughout the day on April 24, 2020, she and Gottlieb communicated about revisions to the purchase agreement and that Gottlieb made revisions she requested. Am. Compl. ¶ 16. After telling Gottlieb that she would sign the finalized agreement as soon as Gottlieb sent it to her, Gottlieb sent the finalized agreement to her at 5:19 p.m. on April 24, 2020. Id. ¶¶ 17–18. Thornton electronically signed the agreement at 5:26 p.m. that day, and Caramagno signed it at 5:29 p.m. that day. Resp. at 8. Thornton then took various actions to proceed with the purchase, such as depositing earnest money, communicating with Gottlieb about scheduling a home inspection and appraisal, and visiting the property. Id. ¶¶ 23, 28, 31.

Based on these allegations, it is plausible to assert that the parties no longer deemed the 5 p.m. acceptance deadline as a necessary condition for acceptance.  Given that Gottlieb sent the purchase agreement after the deadline and that Caramagno signed it after the deadline, it is certainly reasonable to conclude that the seller did not deem 5 p.m. as an operative deadline.  See McCarthy v. Tobin, 706 N.E.2d 629, 632–633 (Mass. 1999) (holding that a seller waived the time limitations formally set out in a purchase agreement by continuing to negotiate and exchange draft agreements past the deadline and failing to object to the passage of the deadline).

For support, Defendants rely in part on Blackburne & Brown Mortg. Co. v. Ziomek, 692 N.W.2d 388 (Mich. Ct. App. 2004), which involved a motion to enforce a judgment.  But Blackburne supports the Court's conclusion.  In that case, the agreement at issue stated that it would not become effective unless the defendants accepted it by a specific time and the plaintiff countersigned it.  692 N.W.2d at 395.  The court found that, because the defendants let the time period lapse before returning the agreement, the defendants were extending an offer for further negotiations.  Id. at 396.  It determined that no contract existed because the plaintiff never communicated any acceptance of the offer, and nothing suggested that the plaintiff otherwise manifested acceptance of the offer.  Id.  In contrast, here the contract was signed by both parties after the supposed deadline.

Defendants also rely on Pakideh v. Franklin Comm. Mortg. Grp., Inc., 540 N.W.2d 777 (Mich. Ct. App. 1995), which involved not the sufficiency of allegations in the complaint but instead proof at a jury trial.  Further, problems with the offer and acceptance that are not present here informed the court's analysis in that case.  There, the defendant's offer contained a provision that the offer would expire if the plaintiff did not sign, date, and return a commitment letter, along with a fee, by a certain date.  540 N.W.2d at 779.  The plaintiff did not comply with the exclusive method of

acceptance because, while he paid the deposit, he never signed or returned the letter.  Id.  Here, the execution of the contract by both sides after the supposed deadline shows that there was no operative exclusive method of acceptance.

Because Thornton has plausibly alleged the existence of a contract, Defendants are not entitled to dismissal of her breach of contract claim.

### E.  Tortious Interference Claim

Thornton alleges that Gottlieb and Gottlieb Group tortiously interfered with (i) the contract between Thornton and Caramagno for the purchase of the property; (ii) Thornton's business relationship with Caramagno; and (iii) Thornton's business relationship with Quicken Loans, her employer and lender.  Am. Compl. ¶¶ 113–114.

Defendants contend that Thornton's tortious interference claims should be dismissed for three reasons.  First, because she has not sufficiently pleaded the existence of a contract, she has not stated a claim for tortious interference with a contract.  Mot. at 20.  Second, Thornton has not pleaded facts showing that Gottlieb and Gottlieb Group interfered with her business relationship with Caramagno because the amended complaint shows that a legitimate reason motivated their actions: honoring another buyer's purchase agreement that predated Thornton's purchase agreement.  Id. at 21–22.  Third, Thornton has not pleaded facts showing that Gottlieb and Gottlieb Group interfered with her business relationship with Quicken Loans or that damages resulted from any alleged interference.  Id. at 22.

The Court addresses each argument in turn, concluding that Defendants are not entitled to dismissal of the claim that Gottlieb and Gottlieb Group tortiously interfered with the contract and business relationship between Thornton and Caramagno, but they are entitled to dismissal of the claim that they tortiously interfered with Thornton's business relationship with Quicken Loans.

16

### 1. Tortious Interference with a Contract

For the reasons stated above, Thornton has sufficiently alleged that a contract existed between her and Caramagno. Therefore, Defendants are not entitled to dismissal of the tortious interference with a contract claim on the basis that Thornton has not alleged the existence of a contract.

### 2. Tortious Interference with Thornton's Business Relationship with Caramagno

"In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." Health Call of Detroit v. Atrium Home & Health Care Servs., Inc., 706 N.W.2d 843, 848 (Mich. Ct. App. 2005). The elements of tortious interference with a business relationship or expectancy are: (i) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract; (ii) defendant's knowledge of the relationship or expectancy; (iii) "an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy"; and (iv) resulting damage to the party whose relationship or expectancy was disrupted. Id. at 848–849. An individual is liable for tortious interference with a business relationship or expectancy when he or she "interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another." N. Plumbing & Heating, Inc. v. Henderson Bros., Inc., 268 N.W.2d 296, 299 (Mich. Ct. App. 1978). When the defendant's actions were motivated by legitimate business reasons, those actions do not constitute improper motive or interference. BPS Clinical Laby's v. Blue Cross & Blue Shield of Mich., 552 N.W.2d 919, 925 (Mich. Ct. App. 1995).

Defendants are not entitled to dismissal of the claim that Gottlieb and Gottlieb Group interfered with Thornton's business relationship with Caramagno. Defendants' contention that the amended

complaint shows that legitimate reasons motivated their actions disregards the very essence of the allegations in the amended complaint—that Defendants decided not to sell the property to Thornton because of her race. It also ignores the factual content that is described above—and that the Court has stated is sufficient to withstand a motion to dismiss—that Defendants were motivated by racial animus, not legitimate business reasons.

### 3. Tortious Interference with Thornton's Business Relationship with Quicken Loans

Defendants are entitled to dismissal of Thornton's claim that they tortiously interfered with her business relationship with Quicken Loans because Thornton has not set forth facts alleging that Gottlieb and Gottlieb Group induced or caused a breach or termination of the relationship. Quicken Loans is Thornton's employer and lender. Am. Compl. ¶ 14. Thornton has alleged the following regarding Gottlieb's actions and Quicken Loans. After Thornton informed Gottlieb that she would not sign a termination of the purchase agreement, Gottlieb threatened to contact Quicken Loans and ultimately did so. Id. ¶¶ 37–38, 45. Gottlieb told Quicken Loans that Thornton had signed a termination agreement, that the sale for the property was invalid, and that Quicken Loans should cancel the appraisal. Id. ¶ 45. Gottlieb also requested the contact information of Thornton's director and the loan process supervisor, with whom she left an irate voicemail. Id. ¶ 47.

Thornton does not allege that this conduct induced or caused a breach or termination of her relationship with Quicken Loans—either an employer-employee relationship or a lender-borrower relationship. Instead, she asserts that, as a result of Gottlieb's actions, she suffered "embarrassment, mental anguish, outrage and humiliation." Id. ¶ 119. But this alleged harm does not constitute a breach or termination of the relationship between Thornton and Quicken Loans. See Puetz v. Spectrum Health Hosps., 919 N.W.2d 439, 453 (Mich. Ct. App. 2018) (holding that a defendant had interfered when it "terminated or prohibited" a business relationship). Her

18

allegations of emotional harm show that her mental state was impacted, but not her relationship with Quicken Loans.

Therefore, Defendants are entitled to dismissal of this claim.

### F. Fraudulent Misrepresentation Claim

Thornton alleges that Defendants made a material misrepresentation by representing to her that there were no pending claims on the property and then later representing to her that there was a prior pending claim. Am. Compl. ¶¶ 122–124.[5] In their motion, Defendants contend that Thornton has not pleaded facts showing that any misrepresentation was knowingly made or that Thornton detrimentally relied on the representation or suffered any injury. Mot. at 23–24.

Under Michigan law, to establish a claim of fraudulent misrepresentation, a plaintiff must prove that: (i) the defendant made a material representation; (ii) the representation was false; (iii) "when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion"; (iv) the defendant made the representation with the intention that the plaintiff would act upon it; (v) the plaintiff acted in reliance upon it; and (vi) the plaintiff suffered damage. Bergen v. Baker, 691 N.W.2d 770, 774 (Mich. Ct. App. 2004) (punctuation modified). "In allegations of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity." State ex rel. Gurganus v. CVS Caremark Corp., 852 N.W.2d 103, 112 (Mich. 2014) (quoting Mich. Ct. R. 2.112(B)(1)).

Thornton has set forth sufficient factual content from which the Court can draw the reasonable inference that when Defendants represented that there was no prior pending claim on the property,

---

[5] Thornton sets forth other misrepresentations in the amended complaint, see Am. Compl. ¶¶ 127–128, but Defendants' motion challenges only the misrepresentations related to pending claims on the property. Therefore, the Court discusses only these alleged misrepresentations.

they knew the statement to be false or made it recklessly. Michigan courts have explained that questions regarding the state of one's mind, including intent, motivation, or knowledge, may be established by inferences arising from facts and circumstances. Bergen, 691 N.W.2d at 777; Foreman, 701 N.W.2d at 175. Thornton does not present solely conclusory statements of fraudulent intent. Rather, she offers sufficient factual support by alleging that Gottlieb had enough familiarity with and knowledge of the property to inform Thornton—both before and the day on which Thornton executed the purchase agreement—that that there had been previous offers for the property that were too low, that it had been a "long process" in trying to sell the property, and that all prior offers had "fallen through." Am. Compl. ¶¶ 12, 24. Shortly after Thornton appeared and was observed at the property, Gottlieb purportedly discovered that a prior prospective purchaser had never signed a termination and, for the first time, mentioned to Thornton an impediment to the sale. Id. ¶ 33. These allegations regarding Gottlieb's familiarity with the property and sudden discovery of a prior claim make plausible the inference that Defendants knew their representation to be false or made it recklessly.

There are also allegations supporting detrimental reliance. The amended complaint alleges that Thornton took action to continue with the purchase of the property, such as depositing earnest money, and that she suffered damages as a result of Defendants' misrepresentations, which is sufficient at this stage. See Demorest v. Gold, Nos. 308936, 309495, 2013 WL 3942492, at *4 (Mich. Ct. App. July 30, 2013) (finding that similar allegations were sufficient for a fraudulent misrepresentation claim at the motion-to-dismiss stage).[6]

---

[6] In their reply, Defendants purport to add a third reason to dismiss the fraud claim—that Thornton has not pled material misrepresentations given that her claim rests on an invalid contract. Reply at 7. However, a movant may not use a reply brief as the vehicle for raising new arguments. See United States v. Jerkins, 871 F.2d 598, 601 (6th Cir. 1989). In any case, to the extent the argument

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss (Dkt. 11).  The Court grants the motion as to the following claims: Thornton's equal protection claim brought under the federal and Michigan constitution, due process claim brought under the federal and Michigan constitution, and tortious interference claim based on Thornton's business relationship with Quicken Loans.  The Court denies the motion as to the following claims: Thornton's FHA claim, ELCRA claim, §§ 1981 and 1982 claims, breach of contract claim, tortious interference with a contract claim, tortious interference claim based on Thornton's business relationship with Caramagno, and fraudulent misrepresentation claim.

Defendants must file an answer to the amended complaint within 14 days of this Opinion and Order.  A telephonic scheduling conference will be convened on April 13, 2022 at 4:30 p.m.  The parties must file a discovery plan at least seven days before the conference, in accordance with the requirements that will be set out in a forthcoming notice for the conference.


      SO ORDERED.

Dated: March 18, 2022                         s/Mark A. Goldsmith
      Detroit, Michigan                      MARK A. GOLDSMITH
                                   United States District Judge

---

is premised on the absence of a valid contract, that premise has been rejected above, as there are sufficient allegations of a valid contract.